And we'll move to our third case this morning, United States v. Tate and Kellogg. Come on up and just wait for your colleague to get settled. All right, you may proceed. Good morning. My name is Jane Remley. May it please the court, I represent Sandra Kellogg. I would like to discuss the buyer-seller relationship in the context of an alleged conspiracy and the arguments that was raised by the appellee that the presence of Harris as an assistant to Kellogg somehow proved the conspiracy and added to the proof that the conspiracy existed. In this case – Before you start, please, you weren't contesting the buyer-seller jury instruction that was given, are you? No, in fact, we did actually rely on it and the conspiracy within a conspiracy instruction because we believe the jury was properly instructed. But in order to analyze the buyer-seller relationship, the court looks to a number of factors, some of them enumerated. It is a holistic approach, we understand. But there was no evidence in the record that Kellogg was anything other than a buyer. There was only one transaction of any significant quantity, not multiple transactions of large quantity. There were no consignment sales. There was no discussion of customers. There was no warning by Kellogg, no shared interest. And what's really telling, we've highlighted in our brief, was that the only large transaction that Kellogg conducted, she was $200 short. And by that time, there was still not enough trust between the two of them for Tate to front her $200 or lower the price. And she had to come up with the money or the deal was not going to take place. So that is very telling in the sense that they were haggling. At that point, they were haggling just as a traditional, conventional buyer-seller relationship would. And it was over $200. Now, does Harris make a difference? The appellee makes the argument in its brief that a conspiracy between Harris and Kellogg somehow proved a conspiracy with Tate. But really all that did, and even alleged in the indictment, Harris just assisted Kellogg. You seem to concede, maybe that's too strong, but in your reply brief, you almost seem to acknowledge that the government, when viewing all the evidence in the light most favorable to it, established a conspiracy between your client and Mr. Harris. Is that fair? They did work together. They had a common interest. So you agree that for the conspiracy count, because there was a conspiracy within the conspiracy, you agree the government, given the standard on appeal, the government meets its burden as to a conspiracy with Harris alone. I would agree that there was an agreement between Harris to assist her and they worked together. That does not establish a conspiracy with Tate. Right, that's a separate question. But in your opening brief, you seem to argue that there wasn't enough evidence to establish the smaller conspiracy. Unfortunately, I think I have to concede that. You seem to in your reply. I wish I could get away from that, but I couldn't. But to do so for him to assist her as a buyer doesn't, and in fact it actually expands the scope of inquiry, what was Tate's relationship with Harris? So we look. Did they negotiate? Did they have a shared interest? Was Harris an independent buyer? Did he ever have any relationship with Tate that was not in his role as an assistant to Kellogg? And the answer is no. And so there's not a hub analysis there. There's not Tate conspiring with Harris and conspiring with Kellogg and the two of them working together. That did not happen. There is no relationship between Harris and Tate independent of his assistance to Kellogg. So all that really does is emphasize the nature of the buyer-seller relationship. Now why is this important to Kellogg? She received an enhancement for being in a conspiracy involving five or more people, and she was assessed points for her role in that respect. We do believe that if the conspiracy count is vacated and it is remanded as it should, then the court will have to look more closely at what she really did to supervise anybody if at all. But the conspiracy count wouldn't be vacated in light of what we've just talked about, that there was sufficient evidence for a rational juror to find a conspiracy between your client and Harris. It would just be the enhancement. Yes. Okay. Well, we also argue that because Harris was not charged in the conspiracy, that that is not a conspiracy with Tate, that Kellogg was not in a conspiracy with Tate, and Harris was not in a conspiracy with Tate. But given your acknowledgment that there was a conspiracy between Kellogg and Harris, the conspiracy count wouldn't be vacated. If we agree with you about the Tate conspiracy, it would only affect the enhancement. I take issue because, and here's why. To the extent that a charge in information, charge in a conspiracy, can charge unnamed conspirators, and the government did argue this, if we prove an agreement with anybody to do anything to sell drugs, then we have made our conspiracy count. But Harris wasn't charged, and Harris wasn't in a conspiracy with Tate. So unless somebody is working in total isolation and never asking anybody for anything. But all the conspirators don't have to be charged. There's nothing in the law that says a jury can't find a conspiracy between Kellogg and Harris because Harris wasn't charged for it. Yes, except that we would argue that even if it's uncharged, it has to be proven. And there was no conspiracy shown between Harris and Tate. If we can return to the enhancement for the manager-supervisor situation, the government curiously seems to concede that if you are right on the conspiracy, the enhancement was wrong. But do you really need a conspiracy to be eligible for the manager-supervisor relationship? She just simply has to be involved in a working group of five people under the guidelines. There is some case law that says that, but we don't know what the government was thinking when the court assessed the enhancement. Now, the third subsection of that is a little looser in its language, and the fact that Harris was never proven to be part of the conspiracy and was not a charged conspirator. It may support that, but the court has not yet conducted that analysis, and we don't know. I would like to give some time to my colleague from Mr. Tate and reserve some for rebuttal. If I could just clarify the bottom line of your exchange with Judge St. Eve about whether you're challenging the conspiracy conviction or not. I understood you to be challenging the conspiracy conviction as well as the enhancement. We are challenging the conspiracy conviction and the enhancement because we do believe that even whatever agreement between Kellogg and Harris that existed does not support the charged conspiracy because it doesn't leave them to Tate. Thank you. Thank you. Mr. Riggins. May it please the court. My name is Kenneth Riggins. I represent Christopher Tate, the subject of our conversation with you all just moments ago. And I'll get right to it. Mr. Tate's whole argument surrounds the gun that was found in the car in the midst of count three. Under these circumstances, there was a gun found on the driver's side seat, and Mr. Tate was sitting in the passenger seat. There was drugs found at his feet on the floorboard, but there was also Tia Demmitt who was the supplier for Mr. Tate's girlfriend. She actually came into contact with 15 bricks after Mr. Stennis was killed, and then she tried to move that and turn it into cash for herself. So, Mr. Riggins, you are not challenging the conviction on count one, the conspiracy, or on counts two and four, the distribution of meth. You're only challenging the conviction on count three and the gun enhancement. That's correct. As it relates to count three, that's where my client and two other people were found in the car, and that was where the drugs were found and the gun was found. The thing that's sort of confusing to all of us is that Tia Demmitt was the girlfriend of the individual who was killed who allegedly supplied Mr. Tate with all the drugs that he had. What kind of came out and what makes this significant is that the gentleman who was her boyfriend who died and was killed and murdered in the process, my client offered to help her to get some money. She wanted to turn the drugs that were left to her by her boyfriend into money. The first time that he went out and helped her, he returned the cash to her, which was $10,000. What we find under those circumstances was that her boyfriend, her ex-boyfriend, the guy who passed away, his family came and robbed her at gunpoint and took her cash and looked for the drugs, the additional drugs that would be available. They did not find the drugs, and they didn't find the drugs because Ms. Demmitt took the drugs to her grandmother's house where she stored them until a later time where she could turn those into cash. The evidence showed that when they went out there, they left the grandmother's house with a pillowcase, and in that pillowcase was the drugs and the gun. Now, how things got where they were is a little different. We contend that Ms. Demmitt, who sat behind the driver's seat, had the pistol handy just in case things didn't go the way that she wanted them to go in the midst of trying to turn the drugs into cash, and that although Mr. Tate was in the car, there was no way to show that he actually knew what drugs were in there. They just assumed once they caught him and looked inside the pillowcase that there were drugs that were contained in the car. What about the fact that immediately before then, he had sold two pounds of meth from her home to somebody? Yeah, that's true, but that had nothing to do with the—that was not a part of the count three when they were— But I understand that was—those two pounds weren't charged, but why isn't that evidence directly relevant to his knowledge that the pillowcase contained meth? The government could have had someone on the stand who could have answered that question, how he actually knew or had knowledge of that. We did see that she was responsible and had the drugs near her along with the pistol at all times to protect her interests. Now, one of the questions that was asked to her during the course of cross-examination was, did those drugs belong to you? And if her answer is no, why didn't she turn the drugs over to her boyfriend's family at the time they came to get the drugs? She did not do that because she was engaged in the conspiracy herself and that she was somehow dealing, because she knew that those drugs could be turned into cash. And what we're saying is she's solely responsible, and I think the jury missed it under those circumstances, that she was the one orchestrating it. She's the one that had the power and the firearm. There were no firearms found on my client when they were stopped by the police. Now, if I relate it to the second part is when Mr. Tate was held accountable for the gun bump in the midst of being sentenced by Judge Pratt. Well, under those circumstances, she looked at the two times that there were guns involved, and one was under count three, which is the point of what we're talking about right now. And then later, there was a subsequent raid at his house that turned up a gun in the bedroom along with some cash. And what we say is that my client never got caught with any drugs himself. Now, we acknowledge that the drugs were there at his feet in the car under count three, but if you look at other things, there were no drugs that were used in connection at his house or found anything. So we believe that the consideration that Judge Pratt took under those circumstances was not exactly accurate. She did mention both. She mentioned the drugs that were at his home, no drugs at his home, but there was a firearm there. And then she talked about the gun being placed under the seat, and she thought that the gun was under the passenger seat, which was inaccurate. And what we think is that that needs to be corrected, and that's my time is gone. Thank you. Ms. Wood. Good morning. May it please the Court. Meredith Wood on behalf of the United States. First, I want to address Ms. Kellogg's arguments. In this case, there's no serious question that Kellogg was in a conspiracy to distribute meth. As counsel just conceded, Kellogg conspired with Harris to distribute meth. That's enough to sustain the conviction. As the Court noted, this is the Avila case cited in our brief. Harris and Tate do not need to have conspired. Harris was named in Count 1 of the indictment. He did plead before trial, so he wasn't tried with Ms. Kellogg, but he was named as a co-conspirator in the indictment. And this is conspiracy law. The prosecution can proceed in a smaller subset of the allegations in the indictment. And the jury was instructed on that, correct? That's correct. They received both the buyer-seller instruction and the multiple conspiracy instruction. The question for this Court, as it pertains to Ms. Kellogg, is whether Kellogg also conspired with Tate, because if she did, then she is part of criminal activity that involved five or more participants, which means she's eligible for the manager-supervisor enhancement under the guidelines. She's not eligible if she's not part of the conspiracy? You concede that? Yes. If she didn't conspire with Tate, then there are not five or more participants in the criminal activity in which she was involved, and a two-level enhancement under the guidelines, which doesn't require five or more participants. You conceded that in the District Court as well? I don't believe that came up in the District Court. The Court found that Kellogg was part of the Tate conspiracy. I understand you. Yes. But so this is really your brief was the first time you had to take a position on it? Well, that's correct at sentencing. The District Court on the Rule 29 motion did address this. Trial counsel made the same arguments they're making now, that there was insufficient evidence that Kellogg conspired with Tate, and the court and the government at trial both noted that the conspiracy with Harris, if there was sufficient evidence, that would sustain the conviction, and the District Court did analyze both whether Harris and Kellogg conspired and also whether Kellogg and Tate conspired. But did not address whether Kellogg might be responsible even if she were not part of the conspiracy. That's correct. The District Court and the government agreed it was a close question whether Kellogg conspired with Tate, but that's exactly why the jury was given the buyer-seller instruction. And our argument is that there was sufficient evidence that Kellogg conspired with Tate to distribute meth. This is based on three principal reasons. The first is that she coordinated several deals between Tate and Harris, arranging the logistics. That puts her on the same side of the transactions with Tate, and in one instance with his runner, with Harris on the other side. Second, there were law enforcement warnings between Kellogg and Tate. Kellogg even says, I'll ride for you. And then the third are these distribution-level quantities over a long period of time. So the two transactions that we point to in our brief are these two deals in December of 2019. They're pretty similar in the first one. Harris is the one purchasing meth from Tate's runner, Stewart. Kellogg is the one organizing the deal. She sends Tate's contact information to Harris. She calls it her homie number. Tate tells Kellogg where to meet, and she passes that along to Harris. Kellogg tells Harris to call her when he's ready. Kellogg gives Tate a description of the car that Harris was in. In the second deal, it's a similar thing. Tate tells Kellogg, I'm about to text you the address to give to him. Kellogg asks Harris, are you ready to meet my people? Kellogg asks Harris whether he's on his way to her homie's, again referring to Tate. And she's also providing the description of the car to Tate. So based on those facts, the court or a jury could have determined that Kellogg is the one bridging the divide between a willing buyer and a willing seller. This is much like the case in Gilmer. The defendant's arranging the deal, calling the buyer throughout the day, helping with the logistics, and the court there said the defendant was bridging the gap between the buyer and seller. That's conspiracy because they're on the same side of the deal. I'm also happy to address any other issue if the court has questions or any of the issues raised by Tate's counsel. Equally happy to rest on the briefs. Time is yours. I will rest on the briefs. Thank you. Thank you. I think, Mr. Riggins, you had run out of time. I don't know if there's any rebuttal left on your principle argument. I think there is, so come on up. I would like to expand on the question of whether a third party makes a difference. I tried to distinguish the Avila case in my briefs. United States v. Payton. If you look at it more closely, it talks about the relationship of a middle man, and it breaks down between three people where the conspiracy lies. For instance, in United States v. Thomas, 284, 746, no conspiracy between the broker and the buyer where the broker presumably earned his commission from the seller. In other words, a middle person can be on one or the other side of the transaction. And in this case, it was never the government's theory that Harris did anything more than assist Kellogg. That did not put Kellogg in the same camp as Tate to sell to Harris, which is what I think the government is attempting to establish. Is that the distinction with the Avila case? The Avila case, if you look deeper into it, doesn't really say, I believe, what the government says it does. I believe that you look at when a third person is interjected into the situation to find out where their mind is. It's not about groups. It's about agreements. And just counting bodies doesn't tell you where the agreements lie. And that is throughout conspiracy jurisprudence to understand where the agreements are. And if you look through the record, there was no agreement between Tate and Harris for anything. In fact, it appears as though Tate didn't care who he dropped the drugs off to. Sometimes it was Harris. Sometimes it was Kellogg. Sometimes it was Boe. But it didn't matter. And there is no evidence in the record that Harris was the end consumer at all, that he ever used his own money or kept the drugs for himself to the exclusion of Kellogg. So it's just it doesn't take her out of that position as a simple buyer in the transactions with Tate. What was the origin of the conspiracy within a conspiracy instruction, instruction number 36? I did not try the case, and I don't know, but I believe probably it was a pattern. Submitted by the defense? It might have been. With the buyer and seller instruction? I apologize. I can't tell you how that actually unfolded in the trial court. But I do know that having tried cases in the Southern District, that there are a package of standard instructions that may have been just that. Thank you. Thank you. Our thanks to all counsel. The case is taken under advisement.